# Robinson *v.* Griffin, *et al.*

### *Bill to Concel Deeds and to Surrender Property.*

(Decided June 29, 1911.  56 South. 124.)

1. *Cancellation of Instrument; Bill; Incidental Relief.*—The bill examined and under its allegations, it. is held that, though the money. was procured at a different time from the execution of the deed, the money having been secured after intestate's death, yet sufficient connection was shown between the two wrongs so as to authorize relief as to the money if a cause of action for cancellation of the deeds was established.

2. *Equity; Demurrer; Good in Part.*—Where a demurrer went to the bill as a whole, it was properly overruled, though a part of the relief demanded was obtainable in a court of law, and could only be granted in equity as incidental to purely equitable relief, also prayed for.

3. *Evidence; Burden of Proof.*—Where the answer seeks no affirmative relief, the burden is on complainant to prove the material allegations of his bill.

4. *Deeds; Validity; Undue Influence.*—Where the action was to cancel a deed to respondent by complainant's intestate, the burden of proof shifted to the respondent after proof. by complainant of confidential relations existing between intestate and respondent.

5. *Same; Fraud and Undue Influence; Sufficiency of Evidence.*— The evidence in this case stated and examined and held not to show undue influence or fraud in procuring the deed.

APPEAL from Mobile Law and Equity Court.

Heard before Hon. SAFFOLD BERNEY.

Bill by William Griffin and others, against Allen Robinson, to cancel certain deeds and to require a return of property. From a decree for complainant respondent appeals. Reversed and rendered.

WEBB & McALPINE, for appellant. It is never sufficient to aver fraud as a legal conclusion, but facts must be set out which are legally sufficient to show fraud.— *Kidd v. Morris*, 127 Ala. 393 ;. *Bell v. Southern Home Co.* 140 Ala. 377 ; *Pinkston v. Boykin*, 30 South. 398. This

question was properly raised by demurrer.—*Flewellen v. Crane,* 58 Ala. 627. Counsel insist that the evidence did not justify the decree annulling the deed on account of undue influence.—*Lyon v. Campbell,* 88 Ala. 462; *Jackson,* 87 Ala. 685; *Dunlap v. Robinson,* 28 Ala. 100. Fiduciary relationship alone does not raise presumption of fraud.—*Eastis v. Montgomery,* 93 Ala. 293; *Bancroft v. Otis,* 91 Ala. 279; *McLeod v. McLeod,* 137 Ala. 270; *Woods v. Craft,* 4 South 649. Being without power to annul the deeds, of course, the court was without jurisdiction to render a money judgment.

BOYLES & KOHN, for appellee. Having acquired jurisdiction for one purpose, equity will proceed to grant complete relief.—*Gulf G. Co. v. Jones C. Co.* 157 Ala. 32. The allegations of fraud and undue influence were sufficient.—*McLeod v. McLeod,* 137 Ala. 267; *Cronk v. Cronk,* 142 Ala. 214; *Brisler v. Broom,* 147 Ala. 504; *So. Ry. v. Hayes,* 150 Ala. 212; *Worthington v. Miller,* 134 Ala. 420. Having shown a fiduciary relation, the burden was upon the respondent to show that no undue influence was exerted.—*Tyson v. Tyson,* 37 Md. 583; *Bancroft v. Otis,* 91 Ala. 279; *Shipman v. Furniss,* 69 Ala. 565. This burden was not carried, and the court very properly annulled the deed and rendered the decree complained of.

MAYFIELD, J.—Appellee filed this bill, individually and as administrator of the estate of Carrie Woods, alias Carrie Robinson, deceased, against the appellant; and seeks the cancellation of two deeds by Carrie Woods to the respondent, and the surrender and delivery, by the respondent, of $1,500 belonging to the estate of complainant's intestate, which sum, the bill alleges, was fraudulently appropriated by the respondent to his own use. The bill further alleges that the intestate,

Carrie Woods, died on March 9, 1908, leaving complainant, appellee, as her sole heir and next of kin—he being her half-brother, and having been appointed administrator of her estate. The bill then alleges that in the lifetime of the intestate she was seised and possessed of considerable money and real estate; that complainant as such administrator had taken possession of said real estate, but had been unable to obtain possession of either the money in question or the lands conveyed by the deeds sought to be canceled, because of the wrongs of the respondent complained of in the bill. The bill then alleges in substance, that the respondent, through fraud and deceit, procured the conveyance to himself, from Carrie Woods, of the money in question, which belonged to the estate and converted it to his own use. Demurrer having been sustained to the original bill, it was amended by adding the paragraph numbered 8, alleging that if the deeds were executed by Carrie Woods, the grantor and grantee at the time of their execution, were living together in an unlawful state or relationship, and that her signature to such deeds was procured by fraud and undue influence on the part of the respondent. A demurrer being sustained to the bill as last amended, it was further amended by adding that the complainant and his two children were the only blood relations of Carrie Woods; that complainant had been reared, from childhood, by Carrie Woods, who was his half-sister. The bill then alleges that notwithstanding this blood relationship between complainant and decedent and the respondent; that during that time she assisted for many years prior thereto, a much closer relationship—that of illicit intimacy—between the decedent and the respondent; that during that time she assumed the name of Robinson, instead of her own name, Woods; that the deeds sought to be canceled were made

without any consideration and constituted a gift by the intestate to the respondent; that her signature to the deeds was not of her own free act, and volition, but was procured and superinduced by undue influence on the part of the respondent. If this bill had been filed merely to recover the $1,500, or to compel its payment, or to recover that amount from the respondent, it would be without equity and subject to demurrer, for the reason that it would affirmatively show that the complainant had a complete and adequate remedy at law; but the restoration of the money is sought, for that it was obtained in furtherance, and as a part of the alleged fraudulent scheme and purpose of the respondent to procure the property of the intestate; and this feature of the bill is sought to be maintained only upon the ground that the court, having acquired jurisdiction for one purpose, should proceed to do complete justice between the parties in one suit.

The bill does allege some connection or relation between the acts of the respondent in procuring the deeds, and those in procuring the money; and while, of course, they are separated by a considerable lapse of time (the one culminating during the lifetime of the intestate, and the other, after her death), yet the relation or connection shown between the two wrongs complained of, is sufficient to authorize relief as to the taking of the money, provided the main equity of the bill is made out as for the cancellation of the deeds. Moreover, the demurrer did not go to this part of the bill only, but went to the entire bill, to the effect that it showed that the complainant had a complete and adequate remedy at law. Had the demurrer been directed to that part of the bill only which seeks the recovery of the $1,500, we are not prepared to say that it should not have been sustained. If the fourth ground of demurrer could be said

to go to that part of the bill only, which seeks to recover the money, it is sufficient to say that it is not insisted upon. The only grounds insisted upon by counsel are the first and sixth. The entire demurrer to the original and the amended bills, however, was addressed to the bills as a whole, and not to any particular part.

The address of each of the demurrers was as follows: First demurrer: "Comes now the respondent and demurs to the original bill." Second: "Comes the respondent and demurs to the amended bill heretofore filed." Third: "Comes the complainant and demurs to the amended bill heretofore filed."

The word *complainant* is here used evidently as meaning "respondent," and we treat it as a clerical error.

Each of the demurrers was addressed to the bill as a whole, and not to any part of it and the bill as a whole was clearly not subject to any one of the grounds of demurrer insisted upon in the argument of counsel for appellant. The court therefore committed no error in overruling the demurrer to the bill as last amended. After the demurrers were overruled, the respondent answered, denying the equity of the bill, paragraph by paragraph, and set up few if any affirmative facts as a defense—thereby placing the burden of proof upon complainant.

A great many witnesses were examined on behalf of each party; and the case was submitted for final decree, upon the bill, the answer, and the proof as noted by the register. The chancellor rendered a decree granting the relief prayed in the bill; and from that final decree the respondent prosecutes this appeal. After a careful reading of all the evidence shown in this record, we are unable to concur in the conclusion reached by the chancellor that the complainant was entitled to the relief prayed in his bill and awarded in the chancellor's decree.

The burden was on the complainant, of course, to prove the material averments of his bill, but we do not think that he has discharged that burden, either as to all the material facts alleged, or as to those which would be necessary to support the relief sought and awarded.

It is true that after complainant proved the confidential relation between the grantor and the grantee, the burden of proof as to undue influence was shifted; but the evidence of respondent discharged this burden.

We do not mean to say that none of the averments of the bill are made out—some of them are not even controverted; but a number of others, material and necessary to the relief prayed and granted, are not proven to our satisfaction, while some are actually disproven.

It is shown that Carrie Woods, the intestate, otherwise known as Carrie Robinson, many years ago intermarried with one Lem Woods, who committed a serious crime—a capital offense—and in consequence thereof, absconded, leaving Mobile, the home of the parties concerned in this litigation; that he left about 20 years ago; that Carrie, his wife, and the appellant, Allen Robinson, thereafter lived together as man and wife, though Carrie never obtained a divorce from Woods, that they lived in this manner for a number of years, and Carrie for a long time was known by the name of Carrie Robinson. It is also shown that the complainant was a half-brother of Carrie, and therefore inherited her property, subject to the rights of her husband, Lem Woods, she having no children or other next kin. It is shown by some of the witnesses who boarded with Carrie and the respondent during the time they lived together as husband and wife that they were deemed to be husband and wife, and were accordingly treated by the public; though it is undisputed that there was never any lawful marriage between them.

It was shown by the testimony of the complainant himself, and by several of his witnesses, that Carrie repeatedly said, during her lifetime, that she desired to leave the house in which she was then living to Allen Robinson, and a boy they had raised and by other witnesses that she said she had already so willed the property and so fixed it that Willie Griffin (the complainant) could not get it. It is shown by the testimony of the complainant himself that he and his half-sister were not on speaking terms at the time of her death, and had not been for some time before; that they had often had serious disputes and differences; that Carrie had on several occasions expressed the wish and intention that the complainant should not have any of her property.

While the complainant testifies to the bad state of feeling between his sister and himself, and to the intimate relations between her and the respondent, he also claims, in other parts of his testimony, that she had said she intended to leave her property to him and his children, and that she had declared that the respondent should not have her property. But he contradicts himself, flatly and repeatedly, as to many of these declarations attributed to his sister, as to conversations between them, and those between her and the respondent.

It is shown by the depositions of the witnesses George J. Sullivan, of the accuracy of whose testimony there seems to be no dispute, who appears to have been disinterested, and who was introduced by the complainant, that the respondent, Allen Robinson, and Carrie Woods, otherwise called Carrie Robinson, had lived together, at one place near the residence of the witness, for 15 or 20 years; that they rented the house in which they lived from his mother, and that he thought they were husband and wife—they being generally so regarded in the community; that the respondent was a

[Robinson v. Griffin, et al.]

hardworking, industrious man; that he paid his rent promptly, and was a first-class tenant; that he and Carrie were always at their business, and that during the time they lived in his mother's house they carried on a cookery and boarding house, working together in the business as husband and wife; that Allen was not engaged about that business all the time, but was also engaged as a teamster, doing public hauling, and witness thought he sold wood at a woodyard.

It was shown by one of the complainant's witnesses, Alfred Jenkins, who seems to have been favorably inclined to the complainant, that Carrie told him, the night she died, that she and complainant had fallen out and that complainant had talked of beating her; that witness tried to get her to make up with complainant, and she said she would if he would beg her pardon, etc. Yet it was admitted by the complainant himself that he was not speaking to his sister at the time of her death, nor just prior thereto. It is shown by this record—by plaintiff's own testimony—that notwithstanding this, and the fact that complainant had not visited his sister during her last illness, he went to her home and into her room about twenty minutes after her death, in order to get a chest which he thought contained her money, and carried the same to his house where he broke it open and took out some papers; and that he delivered this chest to respondent who demanded it as the property of his wife.

As before stated, it is shown by the testimony of the complainant himself and by that of a number of the witnesses, that Carrie had often expressed the intention of leaving her property to Allen; though it should be stated that at other times they testified that she had said she did not want Allen and his people to get any of her property.

We think it is shown by this record and partly by the evidence brought out in behalf of the complainant, that the respondent paid Carrie Woods, the intestate, $1,000 for one piece of property, and $800 for the other, and that the purchase was made and paid in cash. It is further conclusively shown that after the death of Carrie, the defendant took $1,100 from the house and deposited it in the First National Bank of Mobile, which money is claimed to be the property of the intestate and not that of the respondent.

While the evidence does not fully satisfy us as to whether this eleven hundred dollars was the separate property of Carrie, or that of Allen, we are inclined to the opinion that the complainant has failed to discharge the burden of proving that it was Carrie's money. We find that the proof contained in this record conclusively shows that Allen purchased the property from Carrie, and paid her a valuable consideration therefor in cash; and we find nothing to show that these conveyances were obtained from Carrie by undue influence, fraud, or force. To the contrary, it appears that it was the act of her free will and accord. And there can be no doubt that she had the right to make these conveyances upon the consideration of money paid by Allen, nor for that matter, the right, if she so desired, to give him the property; and we think the proof shows that it was her desire that he should have the property—which was only natural, under the circumstances.

While it is shown that the relation between intestate and respondent was unlawful, yet it is undisputed that they did live as husband and wife for a great number of years, and they seemed to have treated their business and property as that of legal husband and wife. They were both industrious and frugal, and desired to save and accumulate property, in which they were successful

[Robinson v. Griffin, et al.]

in some degree; and what each had, no doubt, was the result of the joint efforts of both, through a long life spent together as husband and wife, and it was but natural that each should have desired the survivor to have what was left by the other.

This record satisfies us that such was the intention and purpose of Carrie in making these conveyances to Allen. It may be that the whole of the consideration was not paid, or that the money which passed was the money of both grantor and grantee, or that it was the property of Carrie alone. As to this there is no proof. However, even conceding that the proof had shown that there was in fact no consideration paid by Allen, yet it nevertheless conclusively appears, we think, that the conveyances were voluntary, there being absolutely no proof to show any persuasion, threats, undue influence, or fraud on the part of Allen to induce Carrie to make them. And the intestate being at the time of her death on unfriendly terms with her half-brother, her sole next of kin, it was but natural that she should prefer that Allen should have her property.

It was shown by the testimony of Dr. Sullivan that the respondent was an industrious negro, and had accumulated considerable money, he having left with witness, at different times, various sums, amounting to more than 1,700 at the time witness paid it over to respondent. So it is not at all improbable that he had, or could have obtained, the $1,800 with which, as testified, he purchased this property. In fact, the testimony of Dr. Sullivan, who attested the conveyances, and that of the notary who took the acknowledgments, is to the effect that the money was actually paid over at the time of the making of the conveyances. There is no proof whatever to contradict this, and considering all the evidence and all the circumstances connected with the

transaction, we are unable to find proof sufficient to support the material allegations of the bill, that these deeds sought to be canceled were forgeries, or that they were obtained by undue influence on the part of Allen, or that he had been guilty of any fraud in the matter of obtaining such conveyances, such as would authorize a court of chancery to cancel the deeds; but, on the other hand, we are persuaded that the evidence in this record shows that these conveyances were voluntarily made by the grantor; that they disposed of her property in exact accordance with her wishes, and that the title to the property should be allowed to remain where she has so voluntarily placed it. Indeed, if the testimony of the attesting witnesses and of the notary who took the acknowledgments (and this is all that appears in reference to them) is to be believed—and we find nothing to discredit the same—the transactions involving these conveyances were free from fraud, undue influence, or coercion.

It follows that the decree of the chancellor must be reversed; and a decree will be here rendered dismissing the bill of complaint.

Reversed and rendered.

SIMPSON, McCLELLAN, and SAYRE, JJ., concur.